**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| CHRISTOPHER G. YANAKOS, SUSAN KAY YANAKOS AND WILLIAM RONALD YANAKOS, HER HUSBAND, | : : : | No. 10 WAP 2018 |
| | : : | Appeal from the Order of the Superior Court entered July 26, 2017 at No. |
| Appellants | : : | 1331 WDA 2016, affirming the Order of the Court of Common Pleas of |
| | : : | Allegheny County entered August 29, |
| v. | : | 2016 at No. GD-15-022333 |
| | : : | ARGUED: October 24, 2018 |
| UPMC, UNIVERSITY OF PITTSBURGH PHYSICIANS, AMADEO MARCOS, M.D. AND THOMAS SHAW-STIFFEL, M.D., | : : : : | |
| Appellees | : : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE DONOHUE**                 **DECIDED: OCTOBER 31, 2019**

I concur in the result reached by Justice Mundy in the lead Opinion. I respectfully dissent, however, from the lead Opinion's conclusion that the right to a remedy guaranteed by Article I, Section 11 of the Pennsylvania Constitution is not a fundamental right mandating the application of strict scrutiny to an infringing statute.

Article I, Section 25 of the Pennsylvania Constitution provides:

§ 25. Reservation of powers in people

To guard against transgressions of the high powers which we have delegated, we declare that everything in **this article** is excepted out of the general powers of government and shall forever remain inviolate.

Pa. Const. art. I, § 25 (emphasis added). Our citizens' right to a remedy "for an injury done him in his lands, goods, person or reputation" is enshrined in "this article" in Section 11. Pa. Const. art. I, § 11.

I agree with the lead Opinion that the legislative branch plays a role in guiding the development of the law. However, for the reasons discussed in this opinion and contrary to the lead Opinion, I cannot agree with any effort to demote, for the first time, our inviolate Article I, section 11 rights to mere "important" status. Rather, I would begin with the basic acknowledgment that the right to a remedy in Article I, Section 11 is a fundamental right which can only be infringed when there is a showing of a compelling state interest and that the means chosen to advance it are narrowly tailored to achieve the end. Applying that test, in my view, the statute of repose in the MCARE Act violates Article I, Section 11 of the Constitution. The test the lead Opinion adopts limits the transgressions of the General Assembly to those instances where the Commonwealth cannot show that legislation is "substantially related" to achieving some important governmental interest. While I agree with the lead Opinion that the MCARE Act's statute of repose does not even meet this low threshold, in the larger picture I fear that the undemanding test the lead Opinion adopts today places an illusory limit on the General Assembly's prerogative to infringe on the right to a remedy enshrined in Article I and instead ties this Court's hands in fulfilling our obligation to scrupulously protect the right to a remedy afforded in Article I, Section 11.

The touchstone of interpretation of our state constitution is the "actual language of the Constitution itself," *League of Women Voters v. Commonwealth*, 178 A.3d 737, 802 (Pa. 2018) (quoting *Ieropoli v. AC & S Corp.*, 842 A.2d 919, 925 (Pa. 2004)), and the

constitutional language "must be interpreted in its popular sense, as understood by the people when they voted on its adoption. *Id.* (quoting *Jubelirer v. Rendell*, 953 A.2d 514, 528 (Pa. 2008)). Article I, Section 11 of the Pennsylvania Constitution provides as follows:

> § 11. Courts to be open; suits against the Commonwealth
>
> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art. I, § 11. A natural reading of this language does not require resort to any rules of interpretation, as it plainly and unambiguously provides that our courts are open to provide every person with a remedy, by due course of law,[1] for any injury done to him in his lands, goods, person or reputation. It gives every citizen of this Commonwealth an independent constitutional guarantee of legal remedies for private wrongs through our court system. *Craig v. Kline*, 65 Pa. 399, 413 (1870) ("This provision and those as to the administration of justice in the bill of rights, require that all claims for justice between man and man, shall be tried, decided and enforced by the judicial authority of the state and by due course of law."). This foundational entitlement of a right to a remedy in a

---

[1] *See* Ken Gormley, et al., *The Pennsylvania Constitution: A Treatise On Rights And Liberties*, 14.4(c) & n.170 (2004) (hereinafter, the "*Gormley Treatise*"). According to the Gormley Treatise, "[a]lthough at times there may have been confusion between the terms 'due process' and 'due course of law,' it is generally accepted that they are different." *Id.* at 14.4(c) (citing *Baggs's Appeal*, 43 Pa. 512, 517)). The right to due process protects people from deprivations of property or liberty by the government, except "by the law of the land." *Id.* Conversely, the right to "due course of law" provides an "independent guarantee of legal remedies for private wrongs by one person against another, through the state's judicial system." *Id.* (quoting Haus Linde, *Without "Due Process,"* 49 Or. L. Rev. 125 (1970)).

Pennsylvania court has been included in every iteration of our Constitution for well over 200 years, dating back to our Constitution of 1790.

Appellants Christopher G. Yanakos, Susan Kay Yanakos and William Ronald Yanakos (collectively, the "Yanakoses"), have alleged in a lawsuit filed in the Court of Common Pleas of Allegheny County that that they have suffered injuries as a result of medical malpractice by Appellees. Section 1303.513 of the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. § 1303.513, however, establishes a seven-year statute of repose for medical malpractice claims. The Yanakoses argue that this statute of repose violates their right to a remedy under Article I, Section 11, as it prevents them from gaining access to our courts to obtain a remedy for injuries that were not discovered until after the seven-year period had expired.[2] Yanakoses' Brief at 14.

Here, as in the Superior Court, the Yanakoses raise constitutional challenges to the MCARE Act's statute of repose based upon their contention that the right to a remedy in Article I, Section 11 is a fundamental right and that, as such, any legislative infringement must be subject to strict scrutiny. *Id.* at 12, 21. In support of this contention that the right to a remedy in Article I, Section 11 is a fundamental right, the Yanakoses, like the lead Opinion, first recite its long and fabled history, from the Magna Carta to Sir Edward Coke. *Id.* at 14-16. The Yanakoses then direct us to our decision in *James v. Southeastern Penn. Transp. Auth.*, 477 A.2d 1302 (Pa. 1984), in which this Court addressed a

---

[2] In the trial court, counsel for the Yanakoses provided notice to the Attorney General of Pennsylvania pursuant to Rule 235 of the Pennsylvania Rules of Civil Procedure regarding their challenge to the constitutionality of 40 P.S. § 1303.513. In the Superior Court and again in this Court, counsel provided similar notices pursuant to Rule 521(a) of the Pennsylvania Rules of Appellate Procedure. The Attorney General did not enter an appearance in any of these proceedings in response to these notices.

constitutional challenge, pursuant to the equal protection provisions of the federal and Pennsylvania constitutions, to a legislatively-enacted limitation (a six-month notice requirement) on an injured individual's right to file suit against the Philadelphia transportation authority.

The Court in *James* first set forth the three levels of scrutiny at issue. Where a suspect classification has been made or a fundamental right has been burdened, the standard of review is strict scrutiny, pursuant to which a law may only be deemed constitutional if it is narrowly tailored to a compelling state interest. *Id.* at 1306; *Shoul v. Comm. Dep't of Trans., Bureau of Driver Licensing*, 173 A.3d 669, 676 (Pa. 2017). Where "important,"[3] but not fundamental rights have been affected, or if sensitive classifications have been made, an intermediate standard of review is applied. *James*, 477 A.2d at 1306. The Court in *James* described this level of scrutiny as involving three elements: (1) the governmental interest is important, though not "compelling," (2) the governmental classification or infringement on a right must be drawn so as to be closely related to the objectives of the legislation, and (3) a person excluded from enjoyment of an important right or benefit must be permitted to challenge the denial on the grounds that his particular denial would not further the governmental purpose of the legislation. *Id.* at 1307. Finally, if the right is neither fundamental nor important, the legislation only needs to satisfy "rational basis" review, pursuant to which a law must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it

---

[3] In summarizing challenges to infringement of "important rights," the Court cited to Professor Laurence Tribe's description of them as a significant interference with "liberty or a denial of a benefit vital to the individual." *James*, 477 A.2d at 1306 (quoting L. Tribe, *American Constitutional Law* § 16-31 (1978)).

employs must have a real and substantial relation to the objects sought to be attained." *Id.* at 1306; *Shoul*, 173 A.3d at 677.

With these standards of review established, the Court in *James* directed itself to determining whether the type of right implicated was fundamental, important, or neither fundamental nor important. *James*, 477 A.2d at 1306. In this regard, we indicated that the United States Supreme Court had recently defined "fundamental rights" by stating that when determining whether the denial of a particular right is deserving of strict scrutiny, "we look to the Constitution to see if the right infringed has its source, explicitly or implicated, herein." *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1118 (Pa. 2014) ("Fundamental rights generally are those which have their source in the Constitution."). Looking to the text of Article I, Section 11, we concluded that it contains no right to sue the Commonwealth, as its second sentence provides an express limitation on the scope of its protections, namely that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, § 11. Accordingly, in *James* we held that "there is no 'fundamental right' to sue the Commonwealth, for such right is explicitly limited by Art. I, § 11 of the Constitution of Pennsylvania."[4] *James*, 477

---

[4] For the same reason, this Court in *Zauflik* applied intermediate scrutiny rather than strict scrutiny to an equal protection challenge to statutory damages caps on recoveries under the Tort Claims Act, 42 Pa.C.S. §§ 8501–8564. *Zauflik*, 104 A.3d at 1120. We held that the "right" to a full tort recovery "is not a fundamental right warranting strict scrutiny because the predicate right to bring suit against the Commonwealth or its political subdivisions is expressly limited" by, inter alia, "Article I, Section 11 of the Pennsylvania Constitution, which permit[s] the General Assembly to limit recovery against governmental units." *Id.* at 1119. Because we concluded that "the right involved is an 'important' one," we applied the intermediate scrutiny test set forth in *James* to decide "whether the Act's damages cap closely serves an important governmental interest, in

A.2d at 1306 ("Section 11 itself authorizes the Legislature to enact laws that direct the way in which a plaintiff might pursue her right to a judicial remedy against the Commonwealth."). For this reason, the Court declined to apply strict scrutiny. *Id.* Instead, because the appellant nevertheless had "an important interest in access to the courts to sue the Commonwealth in cases where the Commonwealth had consented to suit," we determined that intermediate scrutiny should be employed and applied the three-part test set forth hereinabove.

The Yanakoses contend that *James* compels the application of strict scrutiny in the present context. As the Yanakoses point out, this Court applied intermediate scrutiny in *James* because the language of Article I, section 11 carves out an exception for suits against the Commonwealth. Yanakoses' Brief at 21 (citing *James*, 477 A.2d at 1306). Article I, Section 11 contains no exceptions, however, with respect to actions between private parties, and thus by implication the opposite must also be true, namely that there **is** a fundamental right to a remedy in suits against private entities (like UPMC in the present case). *Id.*

The Yanakoses' contention that *James* must be read to establish that in actions between private parties, Article I, Section 11's right to a remedy is fundamental is amply supported. In *James* we held that no fundamental right existed **only** because the second sentence of Article I, Section 11 provides an express limitation on the scope of its protections for suits against the Commonwealth, thus strongly implying that in suits between private parties, where no such limitation applies, Article I, Section 11 confers a

this instance, the protection of the public treasury against large and unpredictable tort recoveries." *Id.*

fundamental right.[5] We previously articulated this reasoning in *Smith v. City of Phila.*, 516 A.2d 306 (Pa. 1986), a suit filed against the City of Philadelphia and its gas works corporation after an explosion. In explaining why we were applying intermediate scrutiny to the plaintiffs' equal protection claims rather than strict scrutiny, we made it abundantly clear that the only reason we were doing so was because the suit was against Commonwealth entities:

> No fundamental rights are implicated because the right to a full recovery in a tort suit brought against the Commonwealth or its political subdivisions is expressly limited by our interpretation of … Article I, Section 11 of the Pennsylvania Constitution (permitting the legislature to limit recovery against governmental units). **Strict scrutiny of the classification, therefore, is not required**.

*Id.* at 311 (emphasis added). The implication in *Smith* could not be more clear: except in suits against governmental units, strict scrutiny **is** required because there is no other limitation on the right. I recognize that our decisions in *James*, *Zauflik* and *Smith* all involved equal protection and/or due process challenges rather than, as here, a direct claim for violation of Article I, section 11. There is no principled reason, however, to conclude that a right is fundamental in the context of equal protection and due process claims but is not fundamental for purposes of a direct challenge under Article I, section

---

[5] As indicated above, in *James* we also cited with approval the United States Supreme Court's definition in *Plyler* of "fundamental rights." *James*, 477 A.2d at 1306. Applying this definition of "fundamental rights," the right to a remedy in suits against private entities clearly "has its source, explicitly or implicitly," in Article I, Section 11 of the Pennsylvania Constitution, and is thus a fundamental right.

11. In fact, this Court has employed this precise constitutional analysis in a direct Article I challenge to legislation. *DePaul v. Commonwealth*, 969 A.2d 536, 550 (Pa. 2009).[6]

Moreover, critical to this Court's determination of whether the right to a remedy against private entities in Article I, Section 11 is fundamental is recognition of its placement in our Constitution. The preamble to Article I, which is entitled the "Declaration of Rights," proclaims that it contains the "general, great and essential principles of liberty and free government." Pa. Const. art. I, pmbl. Unlike the United States Constitution, which created a government of limited and enumerated powers,[7] the Pennsylvania Constitution established a government of general powers with the authority to exercise any and all powers not expressly forbidden therein. *Gondelman v. Commonwealth*, 554 A.2d 896, 903-04 (Pa. 1989); *Commonwealth v. Wormser*, 103 A. 500, 501 (Pa. 1918) ("The Constitution of the state permits the Legislature to enact all laws which are not forbidden by its letter or spirit."). Article I, Section 25 invokes special protections to safeguard the rights set forth in Article I.

> §25. Reservation of powers in people
>
> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.

---

[6] In *DePaul*, this Court found that a complete ban on political contributions to individuals affiliated with the gaming industry violated Article I, Section 7's guarantee of freedom of expression and association because it was not narrowly tailored to achieve the General Assembly's compelling interest in negating the corrupting influence and appearance of large contributions. *DePaul*, 969 A.2d at 553. This Court held that merely limiting the size of contributions, rather than prohibiting them entirely, "would be more narrowly drawn to accomplish the stated goal." *Id.*

[7] The United States Constitution has no counterpart to Article I, Section 11 of the Pennsylvania Constitution.

Pa. Const. art. I, § 25. As a result, the framers of our Constitution intended to restrain our three branches of government, including the General Assembly, from interfering with the exercise of the inviolate rights set forth in Article I. *Gondelman*, 554 A.2d at 903-04 This Court has recognized the fundamental nature of a wide variety of Article I rights, including the right to reputational security, the right to petition, the right to free expression, the right to privacy, the right to marry, the right to procreate and the right to make child-rearing decisions. *See Nixon v. Com.*, 839 A.2d 277, 287 (Pa. 2003); *In re Fortieth Statewide Investigating Grand Jury*, 190 A.3d 560, 572–73 (Pa. 2018); *Schmehl v. Wegelin*, 927 A.2d 183, 188 (Pa. 2007); *Pap's A.M. v. City of Erie*, 812 A.2d 591, 604 (Pa. 2002); *Spayd v. Ringing Rock Lodge,* 113 A. 70 (Pa. 1921).

In this regard, when opining on the constitutional dimension of Article I, Section 11, this Court has always recognized that the right to a remedy set forth therein is a **fundamental right**. In *Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970), *modified on other grounds by Sinn v. Burd*, 404 A.2d 672 (Pa. 1979), this Court held that a plaintiff could recover for personal injuries from a negligent defendant in the absence of actual impact. *Niederman,* 261 A.2d at 85. In so doing, we held that "[i]t is **fundamental** to our common law system that one may seek redress for every substantial wrong." *Id.* (emphasis added). In *Flagiello v. Pennsylvania Hosp.*, 208 A.2d 193 (Pa. 1965), this Court abolished the rule that charitable hospitals were immune from liability in tort, stating that "every member of society [is guaranteed] a remedy for a palpable wrong inflicted on him by another member of that society." *Id.* at 195 (quoting *Parker v. Griswold*, 17 Conn. 288, 303 (1844) ("An injury is a wrong; and for the redress of every wrong there is a remedy; a wrong is a violation of one's right, and for the vindication of every right there is a

remedy."). Indeed, as far back as 1847, this Court recognized that the constitutional right to a remedy is both "forever excluded from legislative invasion" and "inviolate":

> The bill of rights, which is forever excluded from legislative invasion, declares that the trial by jury shall remain as heretofore, and the right thereof be inviolate; that all courts shall be open, and that every man shall have redress by the due course of law, and that no man can be deprived of his right, except by the judgment of his peers or the law of the land.

*Brown v. Hummel*, 6 Pa. 86, 90 (1847). In 1859, we further emphasized that Article I, Section 11 is an express limitation on legislative authority and one that places special obligations on the judiciary:

> The bill of rights, §§ 9, 11, declares that no man shall be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land; and that the courts shall be always be open to every man, so as to afford remedy by due course of law for all invasions of rights, …. It seems to us … that … [t]hese provisions are … imperative limitations on legislative authority, and imperative impositions of judicial duty. To the judiciary they say:—You shall administer justice to all men by due course of law, and without sale, denial, or delay; and to the legislature they say:—You shall not intermeddle with such functions.

*Menges v. Dentler*, 33 Pa. 495, 498 (1859). The panoply of rights in Article I, Section 11 are fundamental rights. *See, e.g.*, *Exton Drive-In, Inc. v. Home Indem. Co.*, 261 A.2d 319, 322 (Pa. 1969) ("The right to have justice administered without delay is a fundamental right which should not be infringed unless no other course is reasonably possible."); *Kelly v. Brenner*, 175 A. 845 (Pa. 1934) (refusing to enjoin a local ruling implementing a procedure to assure a sufficient number of jurors for jury pools, indicating that Article I, Section 11 contains "fundamental rights which should not be infringed upon, unless no other course is reasonably possible"); *see also Baggs's Appeal*, 43 Pa. at 516-

17 ("There is nothing plainer in the bill of rights than the principle that all men stand on an equality before the judicial tribunals, and they do not stand so, if the judiciary is bound to admit an inequality created by legislative decree, by which a statute of limitations or any other element of the remedy is set aside or altered for any particular case or person.").

Regrettably, the lead Opinion finds that "the right to a remedy is not a fundamental right." Lead Op. at 10. The lead Opinion's rationale for this conclusion is that it does not want to infringe upon the General Assembly's "prerogative of guiding the formation of the law." *Id.* at 9. The lead Opinion's interpretative methodology improperly uses its goal of allowing the General Assembly to meddle with a citizen's right to a remedy by due course of law in order to define the nature of the right and thus, the level of scrutiny to apply. Aside from this reverse engineering, the lead Opinion offers no support for its conclusion that the right is important but not fundamental.

While I do not disagree that the General Assembly has a role in guiding the development of the law, this Court may not abdicate its constitutional obligation by conferring upon that body free reign to do so. As this Court reminded in *Robinson Twp. v. Commonwealth*, 83 A.3d 901 (Pa. 2013), the General Assembly's legislative power is not absolute, as it is expressly restricted by "certain fundamental rights reserved to the people in Article I of our Constitution." *Id.* at 946–47 (citing Pa. Const. art. I, § 25 and *Nat'l Wood Preservers, Inc. v. Commonwealth*, 414 A.2d 37, 44 (Pa. 1980)). The fundamental rights set for in Article I are "inherent in man's nature and preserved rather than created by the Pennsylvania Constitution," and are "specific limits" on legislative powers. *Id.* at 947 (citing *Appeal of Lord*, 81 A.2d 533, 537 (Pa. 1951), *Appeal of White*, 134 A. 409, 412 (Pa. 1926), and *Commonwealth v. Edmunds*, 586 A.2d 887, 896 (Pa.

1991)).  Article I, Section 11 thus constitutes a "specific limit" on the power of the General Assembly to "guide the development of the law," as it may not do so in ways that deny our citizens their fundamental rights to seek remedies in our courts for injuries inflicted upon them.  *Id.* at 947 (citing *O'Neill v. White*, 22 A.2d 25 (Pa. 1941), *Commonwealth ex rel. Smillie v. McElwee*, 193 A. 628 (Pa. 1937), and *Commonwealth ex rel. McCormick v. Reeder*, 171 Pa. 505, 33 A. 67 (Pa. 1895)).  In this regard, I do not see the application of strict scrutiny as a bar to the General Assembly's role in developing the law, but it does require that any infringing legislation be narrowly tailored to achieve a compelling state interest.

As support for its observation that the General Assembly may play a role in "guiding the formation of the law," Lead Op. at 9, the lead Opinion relies primarily upon this Court's skeletal decision in *Freezer Storage v. Armstrong Cork Co.*, 382 A.2d 715 (Pa. 1978).  In *Freezer Storage*, this Court held that the General Assembly could abolish common law remedies by way of a statute of repose based upon the observation that no citizen has a vested interest in the continued existence of an immutable body of negligence law.  *Id.* at 280.  There is no limiting principle to this grant of legislative prerogative in *Freezer Storage*.  Stunningly, the Court in *Freezer Storage* did not indicate that this power was to any extent restrained by any constitutional limitations.  It rejected the notion that statutes of repose could violate Article I, Section 11 without conducting any constitutional analysis or applying any level of scrutiny whatsoever.[8]

---

[8]  Rather than conduct any constitutional analysis, the *Freezer Storage* Court merely cited to three prior decisions, also devoid of any constitutional analysis, to support its decision. None of these cases provides any substantive support for its contention that the General Assembly may abrogate common law causes of action as it so chooses.  *Id.* at 279-81.

Cases decided since *Freezer Storage* have typically involved situations involving attempts to enforce retroactively legislation that altered a vested legal right.[9]  In *Gibson v. Commonwealth*, 415 A.2d 80 (Pa. 1980), we addressed the implications of our decision in *Mayle v. Pa. Dept. of Hwys.*, 388 A.2d 709 (Pa. 1978), which abrogated the doctrine of sovereign immunity, and the General Assembly's subsequently enacted legislation reinstating it.  With respect to the legislature's attempt to have its legislation apply retroactively, we held that Article I, section 11 precluded the Act from governing causes of action accruing before its enactment.  *Id.* at 83.  In *Ieropoli*, we refused to enforce a new law limiting damages for asbestos-related injuries in a case filed before enactment of the legislation.  *Ieropoli*, 842 A.2d at 929-30.  In *Kondaris v. Portnott Law Assoc., LTD*, 953 A.2d 1231 (Pa. 2008), we determined that delinquent taxpayers had no right to be

---

Of these three cases, one involved a genuine anachronism, specifically, that a husband may not sue a third party for an act of sexual intercourse with his wife, a cause of action historically based upon the outdated notion that a wife, like a servant, was the husband's personal property.  *Fadgen v. Lenkner*, 365 A.2d 147, 149 (Pa. 1976).  In the second case, *Jackman v. Rosenbaum Co.*, 106 A. 238 (Pa. 1919), the Court refused a claim for damages, stating that Article I, Section 11 was limited to actual legal injuries, not those "suffered" pursuant to a centuries-old statute permitting the complained-of behavior.  *Id.* at 241; s*ee Gormley Treatise* § 14.4[g][1] (noting that *Jackman* is "cited in virtually every subsequent remedies case, but without any mention of the context – that the plaintiff was asking the court to overcome a statute whose principles had been established for hundreds of years").  The third case, *Sherwood v. Elgart*, 117 A.2d 899 (Pa. 1954), rejected a challenge to an obscure statute that slightly modified the liability of innkeepers who provided safe deposit facilities.  This Court did so without any discussion or explanation, *id.* at 902 ("after considering appellees' contention we find it to be without merit"), and whether the Court considered the substance of any arguments proffered by the appellees is entirely speculative.  Again, and significantly, in none of these three cases did the Court conduct a constitutional analysis – strict scrutiny or otherwise.

[9]  In *Lewis v. Pennsylvania R. Co.*, 69 A. 821 (Pa. 1908), the Court defined a "vested right" as follows:  "It must be something more than a mere expectation, based upon an anticipated continuance of existing law.  It must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from a demand made by another."  *Id.* at 823.

free from the payment of attorneys' fees imposed by a statute that included a provision retroactively requiring their payment for prior delinquencies, concluding that the challengers had suffered no injury for which they were entitled to a remedy.

The lead Opinion indicates that "[t]his line of cases" (which presumably includes some combination of *Freezer Storage, Gibson, Ieropoli* and *Konidaris*), represents "a shift away from treating the constitutional protections inherent in the remedies clause as a fundamental right," and then cites to *Konidaris* for the proposition that "[b]ecause this Court has 'curtailed' the reach of the remedies clause in the past, it follows that the right to a remedy is not a fundamental right." Lead Op. at 10. No such conclusion follows, for at least two reasons. First, the mention of "curtailing" the reach of the remedies clause was a reference to a single prior case, *Freezer Storage*, in particular its holding that when eliminating common law causes of action, the General Assembly did not have to provide any quid pro quo to injured persons when doing so. *Freezer Storage*, 382 A.2d at 281. This reference was, however, merely dicta, as this legal principle had no application in *Konidaris*.[10] In *Konidaris* we concluded that the General Assembly had not abolished any

---

[10] Despite this reference in *Konidaris* to *Freezer Storage*, the Court gave no weight to its decision. While *Freezer Storage* had presumably held that the General Assembly was free to abolish common law causes of action with impunity without providing a quid pro quo to the injured person, the Court in *Konidaris* ignored this holding entirely, indicating that Pennsylvania courts (among others) continue to "vacillate" on these issues:

> While courts in this Commonwealth and across the country vacillate along the spectrum from holding sacrosanct any injury that was protected under common law at the time a state adopted its constitution, to allowing for revision only where the legislature supplies a quid pro quo remedy, to allowing the legislature free reign to redefine what is a 'legal injury,' all agree that the legislative branch cannot dissolve a right to recover once a case accrues.

rights or defenses of the delinquent taxpayers at all and as a result Article I, section 11 simply had no application. *Konidaris*, 953 A.2d at 1242 ("They fail to demonstrate, however, how their right not to do something is the same as an affirmative defense against an accrued cause of action, which is premised on an injury done to a person."). We emphasized that the purpose of Article I, section 11 is "the protection from legislative action of an individual's remedy for an injury done," and concluded that "[i]n this case, no injury was done." *Id.*

Second, as with *Konidaris*, neither *Gibson* nor *Ieropoli* reflect any "curtailing" of the scope of Article I, section 11. Quite to the contrary, in these cases the Court applied a foundational principle of Article I, section 11 jurisprudence that may be traced at least as far back as our *Menges* decision in 1859 – namely that Article I, section 11 protects the right of litigants to be free from legislative interference with a vested (i.e., accrued) legal right.

> The law which gives character to a case, and by which it is to be decided (excluding the forms of coming to a decision), is the law that is inherent in the case, and constitutes part of it when it arises as a complete transaction between the parties. If this law be changed or annulled, the case is changed, and justice denied, and due course of law violated.
>
> *        *        *
>
> When, therefore, the constitution declares that it is the exclusive function of the courts to try private cases of disputed right, and that they shall administer justice "by the law of the land," and "by due course of law;" it means to say, that the law relating to the transaction in controversy, at the time when it is complete, shall be an inherent element of the case, and shall guide the decision; and that the case shall not be altered, in its substance, by any subsequent law.

953 A.2d at 1242 (citing David Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. 1197, 1206 (1992)).

*Menges*, 33 Pa. at 495; *see also Kay v. Pa. R.R. Co.*, 65 Pa. 269, 277 (Pa. 1870) ("[W]e are bound therefore to say that this law is retrospective in its operation on this case, deprives the plaintiff of a vested right, and is inoperative."); *Lewis v. Pennsylvania R. Co.*, 69 A. 821, 823 (Pa. 1908); *Com. ex rel. Margiotti v. Cunningham*, 10 A.2d 559, 565 (Pa. 1940). In *Gibson,* we summarized these cases and others as holding that "[i]t is well-settled that the Legislature may not extinguish a right of action which has already accrued to a claimant." *Gibson,* 415 A.2d at 82. *Gibson* and *Ieropoli* are both textbook applications of this basic principle. In *Gibson*, the Court refused to permit the General Assembly to eliminate retroactively their vested causes of action against the Commonwealth prior to enactment of sovereign immunity legislation. *Gibson*, 415 A.2d at 83. In *Ieropoli*, the Court held that the legislation at issue eliminated the plaintiffs' causes of action and thus held that its "application to [the plaintiffs'] causes of action is unconstitutional under Article I, section 11." *Ieropoli*, 842 A.2d at 930.

These decisions enforced, and in no respect limited, the rights granted in Article I, Section 11. Because they addressed the application of Article I, section 11 to legislative interference with vested rights, it was unnecessary for the Court to determine whether the rights granted under that provision were fundamental, and indeed none of the cases addressed that issue at all. The propriety of the legislature's ability to eliminate a prospective (unvested) cause of action was not in question in those cases, as it is here. Here the General Assembly passed the MCARE Act's statute of repose in 2002, prior to the accrual of the Yanakoses' claim in 2003. Enactment of the MCARE Act's statute of repose thus eliminated a **prospective** cause of action for medical malpractice. For present purposes, therefore, the correlative case is *Freezer Storage*, in which the Court

acknowledged its understanding that it was confronting a circumstance involving prospective rather than vested legal rights. *Freezer Storage*, 382 A.2d at 279 n.4 ("It should be acknowledged that appellant makes no claim that this statute deprives him of a cause of action which had already accrued to him before the statute became effective.").

As discussed above, in *Freezer Storage* this Court held that the legislature is free to abolish common law causes of action without any constitutional limitations on its legislative prerogative to do so. The Court did not even consider the possibility that Article I, section 11 might require the implementation of necessary constitutional protections before the prospective legal rights of our citizens to a remedy may be eliminated. We have been asked by the Yanakoses in this case to do what was not done in *Freezer Storage* – to decide whether the legislature's ability to abolish causes of action is subject to limitations under Article I, section 11 and, if so, to conduct a constitutional analysis to determine the level of scrutiny that must be employed commensurate with the placement of a remedies clause in Article I of our charter. By subjecting the MCARE Act's statute of repose to intermediate scrutiny, the lead Opinion's decision abrogates *Freezer Storage*, as it places a constitutional limitation on the General Assembly's power to eliminate common law causes of action. My disagreement is certainly not with the lead Opinion's decision to reject *Freezer Storage*, but rather with the level of scrutiny that must be applied. Puzzlingly, the lead Opinion appears to be simultaneously rejecting *Freezer Storage's* unreasoned carte blanche deference to the General Assembly, while at the same time relying on the case to justify its application of intermediate rather than strict scrutiny. The lead Opinion does not explain how *Freezer Storage* could have any

precedential value with regard to whether the rights conferred in Article I, section 11 are fundamental, as the case did not even broach the topic (much less decide it).[11]

As I believe that Article I, section 11 is a fundamental constitutional right, I am also of the view that the proper test for determining whether it has been violated is strict scrutiny. *See, e.g.*, *Shoul*, 173 A.3d at 676. To satisfy the requirement of narrow tailoring, there is a heavy burden to justify the statutory scheme at issue by demonstrating that the enactment has been "structured with 'precision,'" which in turn requires that the General Assembly has "selected the 'less drastic means' for effectuating its (compelling) objectives." *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17 (1973); *DePaul*, 969 A.2d at 553. To say that the statute of repose provision in the MCARE Act was not narrowly tailored is, in my view, self-evident. The statute of repose is just one of numerous procedural and substantive devices included in the MCARE Act to limit or eliminate the availability of remedies to individuals injured by the alleged malpractice of health care providers.[12] The General Assembly adopted these multiple measures without

---

[11]  We may well question whether *Freezer Storage* has any Article I, section 11 precedential value at all, given its complete lack of any substantive constitutional analysis. This Court has held that decisions devoid of reasoned analysis have "very little if any precedential value." *William Penn Sch. Dist. v. Pa. Dept. of Educ.*, 170 A.3d 414, 443 (Pa. 2017) (citing *Ario v. Reliance Ins. Co.*, 980 A.2d 588, 598 (Pa. 2009) (Saylor, J., concurring)); *cf.* Kenneth Anthony Laretto, *Precedent, Judicial Power, and the Constitutionality of "No-Citation" Rules in the Federal Courts of Appeals*, 54 Stan. L. Rev. 2017, 1050 (2002) ("[J]udicial decisions are precedential authority unless they contain a negligible amount of legal reasoning … [and the] act of adjudication alone … cannot sustain the precedential authority of a decision that is not solidly grounded in legal reasoning.").

[12]  In addition to the statute of repose, the MCARE Act eliminated, inter alia, the collateral source rule, 40 P.S. § 1303.508; the prohibition on reducing damages to present worth, 40 P.S. § 1303.510; the allowance of lump sum awards for future damages, 40 P.S. § 1303.509; and the plaintiff's choice of forum.

any studied analysis of the impact of any particular measure on the desired legislative goal. Contextually, the statute of repose appears to be an add-on to the unstudied list of multiple restraints to reduce malpractice claims and damage awards in the surviving lawsuits.

The lead Opinion correctly concludes that the MCARE's statute of repose does not even satisfy the test for intermediate scrutiny (that the legislation is "substantially related" to achieving some important governmental interest). The lead Opinion's analysis establishes that there was no evidence to connect the measure with any effect on the legislative goal of reducing malpractice insurance premiums. Concurring Op. at 11-16. No evidence of record establishes that the MCARE Act's seven-year statute of repose would have a significant effect on medical malpractice insurance rates (particularly given the exceptions for foreign objects cases and those brought by minors). *Id.* at 15-16.

Given that the MCARE Act's statute of repose cannot meet the less exacting substantial relationship test, it is beyond dispute that the MCARE Act's statute of repose cannot meet the strict scrutiny test. However, by concluding that the right to a remedy is important but not fundamental, the lead Opinion would empower the General Assembly to abolish a cause of action if it can demonstrate a "substantial relationship" to a stated goal. The General Assembly need not establish that the governmental interest is compelling or that the legislative goal could not be accomplished without depriving a citizen of her right to a remedy. The lead Opinion would adopt a rule that will require a deference to the legislative branch that Article I, section 11 does not permit. I cannot agree with the Court's decision to adopt this diluted constitutional analysis. It is our role as the judicial branch of government to scrupulously protect the right to a remedy afforded

by Article I, Section 11 and to give it due recognition as a fundamental right. Over centuries of jurisprudence, this Court has heretofore recognized the fundamental nature of this right in the cases in which we took the time to consider its constitutional dimension and the appropriate level of scrutiny to view legislative infringements – strict scrutiny. In a challenge like the one presented here, where the statute, on its face, establishes a plethora of means to achieve the stated governmental interest that are less restrictive than the abolition of a right to a remedy, the unconstitutionality of the MCARE Act's statute of repose should be readily apparent.

For these reasons, I concur in the result, namely that the MCARE Act's statute of repose is unconstitutional. I dissent from section II of the lead Opinion's opinion in its entirety. I join in section I and in section III to the extent that this section holds that the MCARE's statute of repose does not even satisfy the test for intermediate scrutiny (and thus plainly would not meet the more exacting test for strict scrutiny).